IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL CASE NO. 3:12-cr-00007-TCB-RGV |
| HERBERT B. DIX | |

## MAGISTRATE JUDGE'S FINAL REPORT, RECOMMENDATION, AND ORDER

Defendant Herbert B. Dix ("Dix") is charged with eighteen counts of knowingly and willfully misapplying and obtaining by fraud, funds, assets, and property having a value in excess of $100 that were the subjects of grants and assistance under the Child Nutrition Act of 1966, as amended, 42 U.S.C. § 1771 et seq., in violation of 42 U.S.C. § 1760(g) and 18 U.S.C. § 2, and with eighty-three counts of knowingly and unlawfully possessing forged securities of the State of Georgia, specifically incomplete Georgia Women, Infants, and Children Program ("WIC") vouchers, which were falsely completed, signed, and endorsed by an authorized representative of a Georgia WIC participant, with the intent to deceive another organization, specifically United Community Bank, in violation of 18 U.S.C. § 513. [Doc. 1]. Pending before the Court are Dix's motion to suppress statements,

[Doc. 18], and motion to suppress evidence, [Doc. 19]. Following an evidentiary

hearing on October 16, 2012,[1] Dix filed a post-hearing brief, [Doc. 30], to which the

government responded, [Doc. 31], and the pending motions are ready for ruling.

For the following reasons, it is **RECOMMENDED** that Dix's motions to suppress,

[Docs. 18, 19], be **DENIED**.

## I. STATEMENT OF FACTS

On the morning of December 20, 2010, approximately eighteen law

enforcement officers, including agents from the United States Department of

Agriculture, Office of the Inspector General ("USDA-OIG"); the Georgia Department

of Community Health ("GDCH"); and the Griffin Police Department ("GPD"),

arrived at Spank's Quick Stop,[2] a business owned by Dix and located at 1236 North

Hill Street, Griffin, Georgia, to execute a federal search warrant. (Tr. at 4-5, 7); see

also (Gov. Ex. 1 (search warrant)). Law enforcement agents were investigating Dix,

---

[1] See [Doc. 27] for a transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the government introduced exhibits during the hearing, which will be referred to as "(Gov. Ex. ___)."

[2] Spank's Quick Stop is a small convenience store located in a low-income, high-crime neighborhood. (Tr. at 6-7, 47). The store is 800 to 1,000 square feet in size, or about the size of a two-car garage, and has one larger main room, a small rear storage room, and a restroom. (Tr. at 7, 38, 47).

Spank's Quick Stop, and its employees for illegally exchanging WIC vouchers for cash.[3]  (Tr. at 5-6); see also (Gov. Ex. 2).

Prior to executing the search warrant, law enforcement waited at a nearby location for Dix to arrive at the store.[4]  (Tr. at 12).  After Dix arrived and opened Spank's Quick Stop some time after 10:00 a.m.,[5] members of the GPD, who were wearing civilian clothing, body armor, and jackets or badges identifying them as law enforcement, entered the store with their weapons drawn, announcing that they were the police and that they were executing a search warrant.  (Tr. at 13, 46-47, 56).  Upon entering Spank's Quick Stop, GPD discovered Dix and an employee, Amanda Wise ("Wise"), at the register near the rear of the store.  (Tr. at 13, 48, 55).  In order to secure the premises, GPD handcuffed both individuals and patted them down for

---

[3] WIC vouchers are federally funded and issued by the GDCH to low income women and children to purchase basic foodstuffs from authorized stores.  (Tr. at 8-10, 30).  Under the rules and regulations of the program, the authorized store may not provide cash to the WIC voucher program participants in exchange for the WIC vouchers.  (Id.).  On a number of occasions between April of 2010 and November of 2010, an undercover police officer had entered Spank's Quick Stop and given Dix or his employees WIC vouchers in exchange for cash.  (Tr. at 5-6); see also (Gov. Ex. 2 at 7-12 (affidavit in support of search warrant)).

[4] Before traveling to a location near the store, law enforcement gathered for a brief meeting at the GPD.  (Tr. at 11-12, 33, 46).

[5] Another officer had been tracking Dix's whereabouts, ready to notify law enforcement when Spank's Quick Stop was opened.  (Tr. at 12, 33, 46).

weapons.[6]  (Tr. at 13, 48-49).  The GPD officers then immediately took Wise and Dix out of Spank's Quick Stop and turned them over to the federal agents outside.[7]  (Tr. at 13, 38, 48).

Once Dix was outside of the store, he was immediately un-handcuffed by law enforcement.  (Tr. at 14, 40-41).  USDA-OIG Special Agent Douglas Bridges ("Agent Bridges") identified himself as an investigator in the case and told Dix that agents were going to be searching Spank's Quick Stop for the next several hours pursuant to a federal search warrant.  (Id.).  Agent Bridges explained to Dix that he had three choices: (1) he could stand around and watch, but not interfere with the search; (2) he could leave, and give Agent Bridges his cell phone number so that Agent Bridges could call him when the search was over so he could come back; or (3) he could sit down and talk with Agent Bridges, both to answer Agent Bridges' questions and to have any of his own questions answered.  (Tr. at 13-15).  Dix indicated that he wanted to sit down and talk with Agent Bridges.  (Tr. at 16).  In response, Agent Bridges told Dix that he was free to stop talking or leave at any time.  (Id.).

_____

[6] Specifically, GPD Lieutenant Tony Thomason ("Lieutenant Thomason") testified that "[a]s a standard we handcuff [occupants] and that's not that they're under arrest but they're being detained and it's a safety issue to make sure they're not armed or within reach of a weapon."  (Tr. at 48).

[7] Like the GPD officers, the federal agents had weapons and were wearing civilian clothing and jackets or badges that identified them as law enforcement.  (Tr. at 34).

Agent Bridges and another USDA-OIG Special Agent, Don Doles ("Agent Doles") decided to interview Dix in Agent Doles' truck, a four-door Ford similar to an F-150.[8] (Tr. at 16, 42). The three men got into Agent Doles' truck, located "[m]aybe 15 or 20 yards" from the front of Spank's Quick Stop,[9] with Agent Bridges in the driver's seat, Dix in the passenger's seat, and Agent Doles in the back seat. (Tr. at 17). The doors of the truck were closed with the windows rolled up, and no one else was involved in the interview, which lasted about an hour and a half. (Tr. at 17, 24, 41). Dix was not handcuffed during the interview.[10] (Tr. at 41).

---

[8] Agent Bridges testified that they chose Agent Doles' truck "so that there's plenty of room for people to sit and so that, you know, so that we're not discussing anything out in public, people can't see us." (Tr. at 16).

[9] Agent Bridges also testified that before getting into the truck with Dix, he probably would have patted him down to make sure he did not have any weapons. (Tr. at 41).

[10] During this interview, Agent Bridges obtained background information from Dix and asked him about how he got involved in the WIC business and whether he had been buying WIC vouchers for cash. (Tr. at 17-19). Agent Bridges did not believe Dix when he told him that he opened Spank's Quick Stop with lottery winnings. (Tr. at 17). Agent Bridges then asked Dix questions covering the entire operation of Spank's Quick Stop: where Dix bought his groceries, how often he came to the store, when he opened up, how many employees he had, the identity of those employees, whether he had paid his taxes, who had prepared his taxes, etc. (Tr. at 18). Eventually, the questions "got around to had he ever bought WIC vouchers for cash," and when Dix said no, Agent Bridges informed him that he had video evidence contradicting Dix's answer. (Tr. at 18-19). Dix then admitted the allegations. (Tr. at 19).

Throughout the interview, Dix appeared sober and was calm, coherent, and responsive. (Tr. at 20).

While Agent Bridges was talking to Dix, GPD officers set up perimeter security of Spank's Quick Stop's parking lot for the search team. (Tr. at 49). During the security sweep, Lieutenant Thomason looked through the windows of Dix's truck, parked approximately ten feet from where agents were questioning Dix, into the truck's interior. (Tr. at 49, 58). There, in plain view, Lieutenant Thomason saw what appeared to be WIC vouchers and Electronic Benefit Transfer ("EBT") cards.[11] (Tr. at 49-50, 58-59). Lieutenant Thomason went over to Agent Doles' truck, where Agent Bridges was talking to Dix, and asked Agent Bridges to step outside of the vehicle. (Tr. at 21, 50). Lieutenant Thomason then told Agent Bridges that there appeared to be some evidence of WIC fraud in Dix's truck. (Tr. at 21, 50, 59-60).

Agent Bridges initially refused Lieutenant Thomason's request to search Dix's truck, telling him that law enforcement did not have the necessary search warrant. (Tr. at 21). He then returned to Agent Doles' truck to ask Dix if he would consent to a search of his truck. (Id.). Dix agreed, and Agent Bridges then got a written

---

[11] Specifically, Lieutenant Thomason stated that he could see the edges of some WIC vouchers in the driver's door pocket and above the driver's side sun visor. (Tr. at 49, 59). He also testified that he saw an EBT card in the ashtray. (Tr. at 59). No officer tried to open the doors to Dix's truck, (Tr. at 58), which Agent Bridges testified must have been locked, because Dix later gave him the keys to the truck when he gave permission for law enforcement to search it, (Tr. at 43-44).

consent form for Dix to sign, further explaining to Dix that he did not have to let law enforcement search his truck if he did not want to.  (Id.).  Agent Bridges then gave Dix the consent to search form to review.  (Id.).  Dix reviewed and signed the form, (Tr. at 21-23); see also (Gov. Ex. 3 (consent to search form)), and then gave law enforcement the keys to his truck, (Tr. at 23, 43-44, 50).

Lieutenant Thomason and another officer immediately proceeded to search Dix's vehicle.  (Tr. at 50).  The search lasted less than 15 minutes.  (Id.).  As part of this search, a GPD officer ran the tag on Dix's truck and found that it was registered to another vehicle.  (Tr. at 51).  Officers inventoried the contents of Dix's truck, and subsequently turned over the items that they had recovered from the vehicle to Agent Bridges.  (Tr. at 26-27, 50-51); see also (Gov. Ex. 7 (evidence receipt for items seized from Dix's truck)).

While Dix's truck was being searched, Agent Bridges continued to interview Dix in Agent Doles' truck.  (Tr. at 44).  After the interview ended, the agents and Dix got out of the truck.  (Tr. at 24).  Although Dix was free to go, he "st[ood] there . . . at the front of the building just watching" as the agents completed their search of Spank's Quick Stop.[12]  (Tr. at 24-25).   He was not handcuffed at this time.  (Id.).

---

[12] At some point while waiting for agents to finish searching Spank's Quick Stop, Agent Bridges called Dix over to ask him about a name that was in a notebook seized from Dix's pick up truck.  (Tr. at 24-25).  Dix denied knowing the person identified as "Princess" in the notebook, and returned to watching the agents search

After law enforcement had completed the search of Spank's Quick Stop, Lieutenant

Thomason asked Agent Bridges if he was going to arrest Dix, and Agent Bridges

told him no.  (Tr. at 51).  Lieutenant Thomason then told Agent Bridges that there

was an issue with Dix's truck, explaining that the tag on the truck was registered to

another vehicle.  (Tr. at 25-26, 51).  GPD officers then arrested Dix  for this violation

and towed his truck.  (Tr. at 25-26, 51-52).

## II.  DISCUSSION

### A.  Dix's Statements

Dix asserts that the statements he made during the interview with Agents

Bridges and Doles are due to be suppressed because he was not given Miranda[13]

warnings prior to the interview.  [Doc. 30 at 7-9].  "*Miranda*  warnings are required

before any statement may be admitted into evidence at trial which was elicited from

a person in custody through interrogation."  United States v. Adams, 1 F.3d 1566,

1575 (11th Cir. 1993) (citation and internal marks omitted); see also Miranda, 384

U.S. at 436; United States v. Hampton, Criminal Case No. 1:11–cr–00410–RWS–RGV,

2012 WL 1354579, at *13 (N.D. Ga. Mar. 5, 2012), adopted by 2012 WL 1354574, at *1

(N.D. Ga. Apr. 17, 2012) (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th

---

the store.  (Id.).

[13] See Miranda v. Arizona, 384 U.S. 436 (1966).

Cir. 1993)) (alteration in original) (internal marks omitted) ("[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'").[14] "Custody" for purposes of triggering Miranda advisements occurs when "there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[15] United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal marks

---

[14] Because Agent Bridges asked direct questions of Dix, it is clear that "interrogation" occurred. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980) (noting that interrogation includes "express questioning or its functional equivalent"). Accordingly, this component of the circumstances necessary to trigger Miranda protection will not be discussed further herein, and the Court's analysis will focus on whether Dix was in custody at the time the interrogation took place.

[15] Although Dix argues that he was in custody for purposes of Miranda because a reasonable person in his situation would not have felt free to leave, see [Doc. 30 at 8], the "Supreme Court [has] clarified 'that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody,'" United States v. Parker, Criminal Case No. 1:10-CR-0176-JEC-JFK, 2010 WL 5313758, at *8 (N.D. Ga. Nov. 18, 2010), adopted by 2010 WL 5313449, at *1 (N.D. Ga. Dec. 17, 2010) (quoting Maryland v. Shatzer, 559 U.S. 98, 130 S.Ct. 1213, 1224 (2010)). In other words, "'a free-to-leave inquiry reveals *only* whether the person in question was seized.' While 'seizure is a necessary prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest.*'" United States v. Luca-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (alterations in original) (citation omitted). Thus, "the standards are different," and a person is in custody for Miranda purposes only where there is a "restraint on freedom of movement to the degree associated with a formal arrest." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (citations omitted); see also United States v. Cavazos, 668 F.3d 190, 193 (5th Cir. 2012) (citations omitted) ("Custody for *Miranda* purposes requires a greater restraint on freedom than seizure under the Fourth Amendment.").

omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). This determination is made considering the totality of the circumstances, and factors relevant to this determination include, but are not limited to, "the location of the interview, the existence of any physical restraints such as handcuffs or drawn weapons, whether the suspect asked to leave, the officers' demeanor, the degree of pressure applied to the suspect, and whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Martinez-Leal, Criminal Action No. 1: 11-CR-19-TCB-CCH, 2011 WL 3328907, at *15 (N.D. Ga. July 6, 2011), adopted by 2011 WL 3328682, at *3 (N.D. Ga. Aug. 2, 2011) (citations and internal marks omitted); see also United States v. Santos, Criminal Action No. 1:11–CR–259–WBH–CCH, 2012 WL 2061613, at *15 (N.D. Ga. Apr. 24, 2012), adopted by United States v. Hill, Civil Action No. 1:11–CR–0259–WBH, 2012 WL 2062419, at *4 (N.D. Ga. June 7, 2012) (citations omitted).

The standard is objective and the actual subjective beliefs of the defendant and the law enforcement officers involved are irrelevant: custody exists only if a reasonable person under the same set of circumstances would feel "that his freedom of movement had been restrained to the degree associated with a formal arrest."

Martinez-Leal, 2011 WL 3328907, at \*17 (emphasis omitted).[16] "Thus, [t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda warnings in noncustodial settings." United States v. Dudley, Criminal Case No. 1:10–CR–075–CAP–RGV, 2011 WL 1100607, at \*4 (N.D. Ga. Feb. 3, 2011), adopted by 2011 WL 1060659, at \*1 (N.D. Ga. Mar. 24, 2011) (alteration in original) (citation and internal marks omitted); see also United States v. Sharma, No. 6:09–CR–1–ORL–19GRJ, 2009 WL 152868, at \*6 (M.D. Fla. Jan. 21, 2009), adopted at \*1 ("[W]hat the government agents thought or knew about Defendant's situation is wholly irrelevant in the absence of evidence showing that the circumstances were such that a reasonable innocent person would not have felt free to leave."). Dix bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977);[17] see also United States v. Asher, Criminal Indictment No. 1:09–CR–414–JOF/AJB, 2010 WL 4192883, at \*7 (N.D. Ga. Feb. 25, 2010), adopted by 2010 WL 4237579, at \*7 (N.D. Ga. Oct. 21, 2010).

---

[16] "[T]he reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (internal marks omitted) (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).

[17] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Dix contends that the fact that there were numerous officers with weapons drawn executing the search warrant who placed him in handcuffs and took him outside the store into the parking lot shows that he was in custody for purposes of Miranda when he was detained while officers executed the search warrant on the store. [Doc. 30 at 7-9]. However, "[t]he fact that [Dix] was physically detained and handcuffed while the search warrant was executed does not necessitate a finding that [Dix] was under arrest or in 'custody.'" United States v. Toumasian, Criminal Case No. 1:10-CR-0291-TCB-JFK-3, 2011 WL 3798223, at * 10 (N.D. Ga. July 19, 2011), adopted by 2011 WL 3738980, at *5 (N.D. Ga. Aug. 22, 2011); see also Asher, 2010 WL 4192883, at *8 (citations omitted) ("To hold that detention of a suspect while executing a lawful warrant . . . is the legal equivalent of custody for *Miranda* purposes would run contrary to the Eleventh's Circuit's direction to consider the totality of the circumstances in analyzing the issue."). In fact, the Supreme Court has explicitly distinguished detention of an individual while a search warrant is executed from the level of restraint associated with formal arrest. See Michigan v. Summers, 452 U.S. 692, 697-98, 702-03 (1981) (citation omitted) (noting that detention of a suspect during execution of a search warrant is "'substantially less intrusive' than an arrest" and finding that such detention is justified by the search warrant itself for Fourth Amendment purposes). Accordingly, law enforcement agents

entering Dix's store with their weapons drawn, clearly announcing that they were the police and executing a search warrant, patting down and handcuffing Dix and Wise for security purposes, and escorting them outside the store, <u>see</u> (Tr. at 4-7, 13, 38, 46-49, 56), were actions taken to ensure law enforcement's safety in connection with executing the search warrant and fall short of the degree of restraint associated with formal arrest, <u>see</u> <u>Summers</u>, 452 U.S. at 702-03; <u>Toumasian</u>, 2011 WL 3798223, at *2 & n.3, 10-11 (<u>citing</u> <u>United States v. Ritchie</u>, 35 F.3d 1477, 1483 (10th Cir. 1994); <u>United States v. Calloway</u>, 298 F. Supp. 2d 39 (D.D.C. 2003)) (finding that a defendant was not in custody where five to ten officers, some in plain clothing with police vests and some in uniform, used force to breach the door to his residence, had their weapons drawn when entering and securing the residence, had the defendant lie face down on the floor where he was handcuffed while the residence was secured, and had defendant sit up-right against the wall, still handcuffed, in the living room area while the search was being executed).

Nor do the totality of the circumstances show that Dix was taken into custody after agents removed him from the store. Upon exiting the store, Dix was immediately un-handcuffed and informed that he could stay and watch the search, leave the premises, or stay and talk with law enforcement. (Tr at 13-15, 40-41). When Dix stated that he would like to talk to Agent Bridges, he was again reminded

that he did not have to speak with law enforcement and was free to stop the interview at any time. (Tr. at 16). Dix nevertheless agreed to speak with agents in Agent Doles' truck, which was parked in the lot outside Dix's store, several yards away from Dix's own truck. (Tr. at 16-17). Dix remained un-handcuffed throughout the interview, which lasted approximately an hour and a half, see (Tr. at 17, 24, 41), and although the agents were wearing weapons, (Tr. at 34), there is no evidence that Agent Bridges or Agent Doles ever drew those weapons or touched or physically intimidated Dix in any way. Dix never asked to stop the interview or to leave the premises, and in fact remained at the scene watching the agents search his store after the interview had concluded despite the fact that he was free to leave. (Tr. at 24-25).

"Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview" and if a defendant said he "understood the officers' advise that he was . . . free to leave," that "strengthens the force of the instructions." Brown, 441 F.3d at 1347-48 (citation and internal marks omitted). Here, Dix was instructed more than once that he was free to leave, (Tr. at 13-16), and the extensive restraints or coercive circumstances needed to overcome such an instruction are not present, as

Dix was unrestrained throughout the relatively brief interview,[18] which took place in a vehicle located in the parking lot of the business he owned, see Sharma, 2009 WL 152868, at *8 (citations and internal marks omitted) (noting that "[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings"), and "the evidence is undisputed that [Agent Bridges] interviewed [Dix] in a conversational, non-confrontational manner, the atmosphere was cordial and [Dix] was cooperative," United States v. Damiani, Criminal Action File No. 1:10–CR–519–AT/AJB, 2011 WL 7574628, at *5 (N.D. Ga. Sept. 23, 2011), adopted by 2012 WL 983726, at *1 (N.D. Ga. Mar. 20, 2012) (citations omitted); see also (Tr. at 20). In short, there is simply no evidence that Dix was physically restrained in any manner or that he reasonably felt compelled to stay until the questioning had been completed, and the Court finds that Dix's freedom of movement was not restrained at any point during the encounter to the degree

_____

[18] See United States v. McDowell, 250 F.3d 1354, 1363 (11th Cir. 2001) (noting that "there is no fixed time limit to the length of questioning" and finding four-hour interview was not a custodial interrogation); United States v. Muegge, 225 F.3d 1267, 1269-71 (11th Cir. 2000) (per curiam) (finding no custody where defendant was directed by his supervisor to speak with investigators in a secure location where he was interviewed for about two and a half hours and was not formally arrested until almost eight months later); United States v. Manta-Carillo, Criminal No. 11–00103–CB, 2011 WL 3235757, at *2, 4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half).

associated with a formal arrest.[19] See Muegge, 225 F.3d at 1269-71; Hampton, 2012

WL 1354579, at *13 (citations omitted) (finding defendant not in custody where she

was unrestrained in a familiar environment, she was never advised that she was

under arrest but was told that she was free to leave at any time, no agents made

physical contact with defendant or any show of force or display of authority beyond

identifying themselves as agents, and defendant never asked agents to move their

vehicle from blocking her car in the parking lot); Martinez-Leal, 2011 WL 3328907,

---

[19] Dix characterizes the agents' decision to interview him in Agent Doles' truck as an attempt to isolate him so that "people could not see them" and he would not feel free to leave, bringing him into custody. [Doc. 30 at 8-9]. However, "[a] suspect is not in custody simply because law enforcement officers tell [him] they would like to question [him], or speak to [him] inside a confined space like a vehicle. That a suspect answers questions in a police vehicle, with the doors and windows closed, does not necessarily create custodial interrogation." United States v. Johnson, Criminal No. WDQ-10-0799, 2011 WL 6202847, at *4 (D. Md. Dec. 7, 2011) (citations omitted). Considering the totality of the circumstances, Agent Bridges' testimony makes clear that Agent Doles' truck was considered to be a comfortable place for all three men to speak together that would provide privacy from public scrutiny or stigma. See (Tr. at 16); see also Summers, 452 U.S. at 702 (footnote omitted) (considering detention to be less like a formal arrest where defendant was held in a private place while law enforcement executed a search warrant because it "could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station"). Accordingly, the Court does not find Dix's characterization of the location for the interview to be persuasive evidence rendering Dix's interview "custodial interrogation." See Sturm v. Darnell, No. 2:10-CV-00247, 2012 WL 220211, at *7 (S.D. Ohio Jan. 25, 2012), adopted by 2012 WL 604229, at *2 (S.D. Ohio Feb. 24, 2012) (defendant was not in custody where he was told that he was free to leave at any time and did not need to speak with officers, and was interviewed in front of his residence in an unmarked police car that was indistinguishable from a regular passenger vehicle).

at *17; <u>United States v. Haffner</u>, No. 3:09–cr–337–J–34–TEM, 2010 WL 5296920, at *8 (M.D. Fla. Aug. 31, 2010), adopted by 2010 WL 5296847, at *2 (M.D. Fla. Dec. 20, 2010). Accordingly, under the totality of the circumstances here, Agent Bridges was not required to provide Dix with <u>Miranda</u> warnings prior to interviewing him as he was not in custody for purposes of <u>Miranda</u>, and it is **RECOMMENDED** that Dix's motion to suppress statements, [Doc. 18], be **DENIED**.

**B.    The Search of Dix's Vehicle**

Dix also moves to suppress evidence seized from the search of his vehicle, asserting that the consent he gave officers to search his truck was not voluntary. [Doc. 30 at 10-11]. "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." <u>United States v. Garcia</u>, 890 F.2d 355, 360 (11th Cir. 1989); <u>see also</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973); <u>United States v. Reynolds</u>, 526 F. Supp. 2d 1330, 1336-37 (N.D. Ga. 2007). "[W]here the validity of a search rests on consent, the [government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." <u>United States v. Tovar-Rico</u>, 61 F.3d 1529, 1536 (11th Cir. 1995) (first alteration in original) (internal marks omitted) (<u>quoting</u> <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983)). "In order for

consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Id. (quoting Garcia, 890 F.2d at 360). Furthermore, "[t]he voluntariness of the consent must be judged in the light of the totality of the circumstances." Id. at 1535 (citing Schneckloth, 412 U.S. at 227); see also United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002) (alterations, citation, and internal marks omitted) ("In determining the voluntariness of a defendant's consent, . . . a court must look at several factors, which include whether the defendant was free to leave, whether there was coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse to consent, whether the defendant could refuse to consent, the extent of the defendant's education and intelligence, and the defendant's belief that no incriminating evidence would be found.").

Here, the totality of the circumstances shows that Dix's consent was voluntary and not the product of coercive police procedures.[20] As previously discussed, Dix was not in custody at the time he was asked to consent to the search of his truck: Dix was not in handcuffs, he had been repeatedly told that he was free to leave at any time, no weapons had been displayed while he was talking with the officers,

---

[20] Indeed, Dix offers no analysis in support of his assertion that his consent was involuntary, instead apparently relying on a finding that he had been taken into custody in a way that was "inherently coercive" to support his claim that he could not render voluntary consent to search. See generally [Doc. 30 at 10-11].

and Dix had been "remarkably calm," coherent, and cooperative throughout the conversation. (Tr. at 20). Moreover, the evidence shows that Dix, a 45 year-old experienced businessman who could read and write, as evidenced by his completing the GDCH WIC eight-hour training and scoring a 95 percent on the exam, (Tr. at 12); (Gov. Ex. 2 at 5, 12), knew that he did not have to consent to the search of his truck, as Agent Bridges orally informed Dix of his right to refuse the search and gave Dix a written consent form to review that informed him of that same right,[21] (Tr. at 20-22); see also (Gov. Ex. 3). In addition, there is no evidence that any agent made any threats or promises to Dix in order to persuade him to consent to the search. See, e.g., (Gov. Ex. 3 (stating that Dix gave permission to search his vehicle "voluntarily and without threats or promises of any kind")). Under these circumstances, Dix's consent appears from all the evidence to have been voluntary, not the product of undue police coercion.

Furthermore, the circumstances presented in this case are far less coercive than circumstances in which consent has been found voluntary, especially in light of the fact that Dix was not under arrest, nor was he threatened with arrest, at the

---

[21] Specifically, the form states that Dix had "been informed of [his] constitutional rights not to have a search made of the . . . vehicle and containers therein hereinafter mentioned without a search warrant and of [his] right to refuse to consent to such a search" and also acknowledged that he understood that "any incriminating evidence found can be used against [him] in any court proceedings or any other proceedings." (Gov. Ex. 3).

time he gave the consent to search. Cf. United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (holding consent voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (holding consent voluntary despite officers' refusal to accept suspect's conditional consent to search and threats to obtain a search warrant if the suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if refused, they would return and "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (holding consent voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn). The Court therefore finds that Dix's consent to search the vehicle was voluntary and it is **RECOMMENDED** that Dix's motion to suppress evidence, [Doc. 19], be **DENIED**.

### III. CONCLUSION

For the foregoing reasons and cited authority, it is hereby **RECOMMENDED** that Dix's motions to suppress statements, [Docs. 18, 19], be **DENIED**.

There are no other matters pending before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS**

**THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 29th day of January, 2013.

*Russell G. Vineyard*

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE